Markman, J.
We granted leave to appeal to consider whether the victim’s statements to the police in this case constituted inadmissible testimonial hearsay *135 within the meaning of the United States Supreme Court’s decisions in Crawford v Washington, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004), and Davis v Washington, 547 US 813; 126 S Ct 2266; 165 L Ed 2d 224 (2006). The Court of Appeals held that the statements were non-testimonial under the test set forth in Davis, 547 US at 822, because they were made “in the course of a police interrogation under circumstances objectively indicating that its primary purpose was to enable police assistance to meet an ongoing emergency.” People v Bryant (On Remand), unpublished opinion per curiam of the Court of Appeals, issued March 6, 2007 (Docket No. 247039), at 3. Because we conclude on the basis of Crawford and Davis that the “primary purpose of the interrogation [was] to establish or prove past events potentially relevant to later criminal prosecution,” Davis, 547 US at 822, we respectfully disagree and hold that the statements constituted inadmissible testimonial hearsay. Moreover, we conclude that the admission of these statements constituted plain error requiring reversal. Therefore, we reverse the Court of Appeals and remand for a new trial.
I. FACTS AND HISTORY
The victim lived with his brother within a few houses of defendant, from whom he had been purchasing cocaine for three years. The victim’s brother testified that defendant sold drugs to the victim at defendant’s back door. On April 28,2001, the victim told his brother that he planned to redeem an expensive coat that he had pawned with defendant in exchange for some cocaine. On April 29, 2001, between 3:00 and 3:30 a.m., the brother heard gunfire, and at about 3:25 a.m., five police officers responded to a radio dispatch indicating that a man had been shot. They found the victim lying on the ground next *136 to his car at a gas station about six blocks from defendant’s house. The victim had a gunshot wound in his abdomen and appeared to be in considerable pain. In response to the officers’ questioning, the victim indicated that he had been shot at approximately 3:00 a.m. while standing outside defendant’s back door. The victim stated that before being shot he had a short conversation through a closed door with defendant. He identified defendant as the shooter because, although he did not see defendant shoot him, he knew that it was defendant who had shot him because he recognized defendant’s voice. While the victim described defendant as being 40 years old, 5’ 7” tall, and about 140 pounds, according to defendant’s driver’s license, defendant was actually 30 years old, 5’ 10” tall, and 180 pounds. Although the brother testified that the victim knew defendant’s last name, the victim himself told the police that he did not know defendant’s last name.[1] The victim told the police that, after he was shot, he drove himself to the gas station. The victim died within a few hours after he was transported to the hospital. When the police left the gas station, they immediately proceeded to defendant’s house. The police found what appeared to be blood and a bullet on defendant’s back porch and what the police believed to be a bullet hole in the back door. The victim’s wallet and identification were also discovered outside defendant’s house. However, the police did not discover any drugs, guns, bullets, or the victim’s coat when they searched defendant’s house at approximately 5:30 a.m. on the morning of the shooting. Defendant’s girlfriend testified that defendant was not home at the time of the shooting and that she had not heard any gunfire that morning. The medical examiner *137 testified that the bullet that killed the victim had passed through an intermediary target, such as a door. Toxicology tests showed that the victim had consumed cocaine within four hours of his death. Defendant was arrested one year later in California and was extradited to Michigan.
Defendant’s first trial resulted in a hung jury. Following a second jury trial, and after two days of deliberations, defendant was convicted of second-degree murder, being a felon in possession of a firearm, and possession of a firearm during the commission of a felony.[2] The Court of Appeals affirmed. People v Bryant, unpublished opinion per curiam of the Court of Appeals, issued August 24, 2004 (Docket No. 247039).
Defendant appealed, arguing that the trial court erred by admitting the victim’s statements to the police identifying him as the shooter.[3] This Court held defendant’s application for leave to appeal in abeyance pending our consideration of People v Mileski, 472 Mich 927 (2005), and People v Walker, 472 Mich 928 (2005). After we subsequently vacated our orders granting leave to appeal in Mileski and Walker and remanded those cases to the Court of Appeals for reconsideration in light of the United States Supreme Court’s decision in Davis, we similarly remanded this case. On remand, the Court of Appeals again affirmed, concluding that the victim’s statements constituted admissible non-testimonial hearsay. Bryant (On Remand), supra at 3. When defendant again appealed, we granted leave. People v Bryant, 482 Mich 981 (2008).
*138 II. STANDARD OF REVIEW
Whether the admission of the victim’s statements to the police violated defendant’s Sixth Amendment right of confrontation is a question of constitutional law that this Court reviews de novo. People v Drohan, 475 Mich 140, 146; 715 NW2d 778 (2006).
III. ANALYSIS
Defendant argues that the admission of the victim’s statements to the police identifying defendant as the shooter violated his Sixth Amendment right of confrontation. The Confrontation Clause of the Sixth Amendment of the United States Constitution guarantees a criminal defendant the right “to be confronted with the witnesses against him. .. .” US Const, Am VI.[4] In Crawford, 541 US at 59, the United States Supreme Court held that “[t]estimonial statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.” Although the Court left “for another day any effort to spell out a comprehensive definition of Testimonial,’ ” it did say that “[wjhatever else the term covers, it applies at a minimum to prior testimony. . . and to police interrogations.” Id. at 68. The Court defined “[tjestimony” as “ ‘[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.’ ” Id. at 51, quoting American Dictionary of the English Language (1828). The Court explained that “[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person *139 who makes a casual remark to an acquaintance does not.” Id. The Court recognized that “[vjarious formulations of this core class of ‘testimonial’ statements exist,” such as “ ‘pretrial statements that declarants would reasonably expect to be used prosecutorially’ ” and “ ‘statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.’ ” Id. at 51-52 (citations omitted). However, the Court indicated that “[statements taken by police officers in the course of interrogations are . .. testimonial under even a narrow standard.” Id. at 52. The Court stated that “even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class.” Id. at 53. The Court further stated that it was “us[ing] the term ‘interrogation’ in its colloquial, rather than any technical legal, sense.” Id. at 53 n 4. Finally, Crawford concluded that the statement that the defendant’s wife had given in that case in response to police questioning at the police station constituted an inadmissible testimonial hearsay statement. Id. at 53 n 4, 68.
In Davis, the Supreme Court further expounded on the meaning of the term “testimonial hearsay statements.” The Court held that “[statements are nontes-timonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.” Davis, 547 US at 822. On the other hand, “[t]hey are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.” Id. Davis further explained that “in the final *140 analysis [it is] the declarant’s statements, not the interrogation’s questions, that the Confrontation Clause requires us to evaluate.” Id. at 822 n 1.[5]
The statements in dispute in Davis were made to a 911 emergency operator. The victim told the operator, “[The defendant’s] here jumpin’ on me again”; “He’s usin’ his fists.” Id. at 817. The Court held that these statements were non-testimonial. Id. at 829. The Court asserted that Davis was distinguishable from Crawford because in Davis: (1) the victim was “speaking about events as they were actually happening, rather than [as in Crawford] ‘describing] past events .. . hours after the events ... had occurred”; (2) thus, in contrast to the victim in Crawford, the victim “was facing an ongoing emergency”; (3) “the nature of what was asked and answered . .. was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn (as in Crawford) what had happened in the past”; and (4) the victim’s “frantic answers were provided over the phone, in an environment that was not tranquil, or even . . . safe,” while, in Crawford, the victim was “responding calmly, at the station house, to a series of questions ....” Id. at 827 (emphasis in the original; citation omitted). The Court held that the “primary purpose” of the interrogation in Davis “was to enable police assistance to meet an ongoing emergency,” and, thus, the elicited statements were non-testimonial. Id. at 828-829.
In Hammon, a companion case decided with Davis, the police responded to a reported domestic disturbance. When the police arrived, the victim was sitting *141 alone on the porch and the defendant was inside. The victim told the police that the defendant had hit her and thrown her. The Court held that because “the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime,” the victim’s statements to the police were testimonial. Id. at 830. The Court explained that Hammon was distinguishable from Davis because in Hammon: (1) “the interrogation was part of an investigation into possibly criminal past conduct”; (2) “[t]here was no emergency in progress”; and (3) “[w]hen the officer questioned [the victim],... he was not seeking to determine (as in Davis) ‘what is happening,’ but rather ‘what happened.’ ” Id. at 829-830. As the Court further explained:
The statements in Davis were taken when [the victim] was alone, not only unprotected by police (as [the victim in Hammon\ was protected), but apparently in immediate danger from [the defendant]. [The victim in Davis] was seeking aid, not telling a story about the past. [The Davis victim’s] present-tense statements showed immediacy; [the Hammon victim’s] narrative of past events was delivered at some remove in time from the danger she described. [Id. at 831-832.]
By contrast, the Court reasoned that Hammon was similar to Crawford because: (1) “[b]oth declarants were actively separated from the defendant”; “[b]oth statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed”; and (3) “both took place some time after the events described were over.” Id. at 830. Accordingly, the statements in Hammon, like those in Crawford, were testimonial. Id.
In the instant case, there is no question that the victim is unavailable, and defendant did not have a prior opportunity to cross-examine the victim. Therefore, if the victim’s statements to the police were *142 testimonial in nature, they are inadmissible. Crawford, 541 US at 68.[6] Accordingly, the only issue here is whether the victim’s statements were made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation was to enable police assistance to meet an “ongoing emergency,” as defined by the United States Supreme Court, or whether the primary purpose of this interrogation was to establish or prove past events potentially relevant to a later criminal prosecution. Davis, 547 US at 822.
On remand, the Court of Appeals held that the statements in this case were non-testimonial, and thus affirmed defendant’s convictions.[7] We, however, agree *143 with defendant that the statements were testimonial pursuant to Crawford and Davis. The police found the victim lying on the ground outside a gas station. The police asked him what had happened, who had shot him, and where the shooting had occurred. The victim told the police that defendant shot him about 30 minutes earlier at defendant’s house, which was about six blocks away, and that he drove himself to the gas station. These statements related solely to events that had occurred in the past and at a different location. None of these statements referred to events occurring at the time the statements were made, none alleged any ongoing threat, and none asserted the possible presence of the alleged perpetrator. The circumstances, in our judgment, clearly indicate that the “primary purpose” of the questioning was to establish the facts of an event that had already occurred; the “primary purpose” was not to enable police assistance to meet an ongoing emergency.[8] The crime had been completed about 30 minutes earlier and six blocks from where the police questioned the victim. The police asked the victim what had happened in the past, not what was currently happening. That is, the “primary purpose” of the questions asked, and the answers given, was to enable the police to identify, locate, and apprehend the perpetrator.
Davis stated that “in the final analysis [it is] the declarant’s statements, not the interrogation’s ques *144 tions, that the Confrontation Clause requires us to evaluate.” Id. at 822 n 1. The declarant here (i.e., the victim) made these statements while he was surrounded by five police officers and knowing that emergency medical service (EMS) was on the way. Obviously, his primary purpose in making these statements to the police was not to enable the police to meet an ongoing emergency of the type identified by the United States Supreme Court, but was instead to tell the police who had committed the crime against him, where the crime had been committed, and where the police could find the criminal. That is, the primary purpose of the victim’s statements to the police was to “establish or prove past events potentially relevant to later criminal prosecution.” Davis, 547 US at 822.[9]
Further, the officers’ actions do not suggest that the officers themselves considered the circumstances at the gas station to constitute an “ongoing emergency,”[10] at least not as the Supreme Court defines that term. None of the officers testified to taking any actions to secure the area, to search the station for the possible presence of any armed individuals, or to provide cover for other officers. None of the officers indicated that he drew his weapon at the gas station, took up a defensive position *145 out of concern that the shooter might be nearby, or called for any backup assistance to ensure the safety of the officer himself or others in the area. And none of the police officers questioned people who were in or around the gas station (other than the victim and the gas station attendant) or searched in any way at the station for the shooter.[11] Rather, they acted in a manner entirely consonant with officers who knew that the crime had already been committed, that it had been commit *146 ted at a different location, and that there was no present or imminent criminal threat. Indeed, once the EMS unit arrived for the victim, the police left the gas station and immediately proceeded to defendant’s house, where they then called for backup assistance because they feared that defendant might still be inside.[12]
The primary purpose of the police questioning of the victim at the gas station was to determine who shot the victim and where the shooter could be found so that they could arrest him. The police were at the gas station to investigate a past crime, not to prevent an ongoing one, and the victim was not “speaking about events as they were actually happening,” as in Davis, but was “ ‘describing] past events,’ ” as in Crawford and Hammon. Davis, 547 US at 827 (emphasis in the original; citation omitted).[13] The primary purpose of the victim’s *147 statements was not “to describe current circumstances requiring police assistance,” as in Davis, but to “establish[] the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator,” as in Crawford and Hammon. Davis, 547 US at 826-827 (emphasis added).
When the police questioned the victim at the gas station, there simply was no “ongoing emergency,” as that term is defined by the United States Supreme Court. The prosecutor argues that the primary purpose of the interrogation was to enable police assistance to meet an “ongoing emergency” — to find and apprehend a criminal before he injured somebody else. This argument is unpersuasive because an “ongoing emergency” in this sense would almost always exist while the police are investigating alleged crimes. That is, to adopt the prosecutor’s argument would effectively render non-testimonial all statements made before the offender was placed behind bars.[14] This is clearly inconsistent *148 with the commands of the Supreme Court. See, for example, State v Kirby, 280 Conn 361, 385 n 19; 908 A2d 506 (2006) (explaining that “accepting the state’s arguments on this point would render meaningless the distinction drawn by the United States Supreme Court, as they would render virtually any telephone report of a past violent crime in which a suspect was still at large, no matter the timing of the call, into the report of a ‘public safety emergency’ ”); State v Mechling, 219 W Va 366, 377; 633 SE2d 311 (2006) (“[T]he investigation of a past crime— while necessary to prevent fixture harms and lead to necessary arrests — is likely to elicit testimonial statements from witnesses that will be subject to the constraints of the Confrontation Clause.”) See also Fisher, What happened — and what is happening — to the confrontation clause, 15 J L & Policy 587, 614 (2007), which explained:
The presence of an ongoing emergency is important only insofar as it indicates that a declarant’s statement describing criminal activity can fairly be described as part of the event itself, rather than a report or a narrative of it. If the law were otherwise, statements reporting criminal activity or accusing others of crimes would always be nontestimonial until a suspect was in custody and unable to cause further harm. Even more to the point, if the law were otherwise, Hammon would have had to come out the other way and the Court could never have indicated that the latter part of the 911 call in Davis was nontestimonial [sic]. Yet the emergencies in those cases were limited to the criminal events themselves, and when those events ceased occurring, statements describing how they had transpired were testimonial.
Equally unpersuasive is the Court of Appeals argument that the police were “responding to an emergency” because “someone at the gas station was shot and laying on the ground.” Bryant (On Remand), supra at 3. Once again, this type of “emergency” almost always exists *149 when the police respond to a victim who has been seriously injured. That is, if we were to adopt the Court of Appeals analysis, all statements made while the police are questioning a seriously injured complainant would be rendered non-testimonial, and this is also clearly inconsistent with the commands of the Supreme Court by confusing a medical emergency with the emergency circumstances of an ongoing criminal episode. See, for example, Kirby, 280 Conn at 384-385 (“[Although the complainant might have needed emergency medical assistance at the time she made the call, the bulk of her conversation with [the police dispatcher] nevertheless consisted of her account of a crime that had happened to her in the recent past, rather than one that was happening to her at the time of the call,” which “renders the telephone call recording testimonial and, therefore, inadmissible under Crawford”); State v Lewis, 235 SW3d 136, 147 (Tenn, 2007) (“Even though the victim was in a state of distress from his wounds, his comments did not describe an ‘ongoing emergency/ as defined in Crawford, and were instead descriptions of recent, but past, criminal activity as in Hammon”). Most importantly, see Davis, 547 US at 828-829, in which the United States Supreme Court indicated that once the defendant stopped attacking the victim and “drove away from the premises,” “the emergency appears to have ended.” The Court said nothing at all that would remotely suggest that whether the victim was in need of medical attention was in any way relevant to whether there was an “ongoing emergency.” Instead, the Court said that once the criminal event was over, i.e., the defendant had stopped assaulting the victim and left the premises, the “ongoing emergency” was over at least for purposes of evaluating an alleged Crawford violation.[15]
*150 The hearsay statements at issue in the instant case are significantly different from the admissible hearsay statements in Davis, i.e., the statements made to the 911 operator while the defendant was still attacking the victim, because, unlike in Davis, this victim was describing past events, rather than describing a criminal episode as it was unfolding, and, unlike in Davis, this victim was away from defendant and the crime scene, and was in the protection of five police officers. On the other hand, this case is significantly similar to Hammon because in both cases the police were seeking through their questioning to determine what had previously occurred, rather than what was occurring at the time of the questioning, and the victims were separated from the defendants and in the protection of the police. That is, in both Hammon and this case, (1) “[the] declarants were actively separated from the defendant[s]”; (2) “[the] statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed”; and (3) “[they] took place some time after the events described were over.” Id. at 830.[16] *151 Here, the officers were obviously attempting to find out “what had happened in the past,” as evidenced by the fact that the first question asked was “what happened.” The officers were not “seeking to determine (as in Davis) ‘what is [now] happening,’ but rather ‘what happened.’ ” Davis, 547 US at 829-830. Most importantly, the victim’s actual statements pertained to what had happened previously, rather than to what was actually happening at the time of the interrogation. For these reasons, the victim’s statements to the police were testimonial and, thus, inadmissible.
Even assuming that the error here is unpreserved because, although defendant objected to the admission of the evidence, he did not do so on the basis of the Confrontation Clause as the trial in this case took place before Crawford,[17] a reversal is required under the plain error standard. See People v Carines, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Given that this case was pending when Crawford was decided, Craw *152 ford is applicable, Teague v Lane, 489 US 288, 304; 109 S Ct 1060; 103 L Ed 2d 334 (1989), and, for the reasons discussed earlier, Crawford was clearly violated here. That is, there was error and the error was plain.
In addition, in our judgment, the error clearly prejudiced defendant. The evidence against him was far from overwhelming and the victim’s statement indicating that defendant was the one who shot him was obviously extraordinarily damaging. In fact, the prosecutor essentially conceded that the error was prejudicial when, at the suppression hearing before trial, he conceded that the admission of the victim’s statements to the police is a “crucial issue to the prosecutor’s case;... if this court rules that the excited utterance is not going to be admissible, then we won’t have a trial here. . . .” In addition, during his opening statement to the jury, the prosecutor repeatedly referred to the victim’s statements to the police and explained:
The most important piece of evidence you will hear during this trial is [the victim] in many respects speaking to you. [The victim] will tell you that it was the defendant who shot him. Obviously he won’t be here to tell you that. But before he died, the last — one of the last — probably the last thing he was able to say was that Rick shot, Rick shot me .... And ... the police, all of them, heard [the victim] say Rick shot me.... The most important piece of evidence you’ll hear during this trial, in other words, "will be [the victim] in a certain respect speaking to you from the grave and telling you what happened in this case and telling you who’s responsible. ... All of the evidence here but mainly [the victim’s] own words before he died point to [defendant] having pulled the trigger and having killed [the victim]. [Emphasis added.]
The prosecutor also relied heavily on the victim’s statements in his closing statement to the jury, stating:
*153 The main reason we know enough about what happened to be able to decide beyond a reasonable doubt whether the charges that have been made out here, the main reason we know is because of [the victim’s] words himself, his own words to you through those police officers in the early morning of April 29th, 2001. [Emphasis added.]
Further evidence that the error was prejudicial is the fact that defendant’s first trial resulted in a hung jury. Finally, the error “seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.” Carines, 460 Mich at 763 (citation and quotation marks omitted). For these reasons, we believe that defendant is entitled to a new trial.
We also agree with defendant that the issue whether the victim’s statements are admissible under the hearsay exception for dying declarations is not properly before this Court.[18] At the preliminary examination, the prosecutor argued that the statements were admissible as either excited utterances or as dying declarations. The district court originally ruled that the statements were inadmissible because there had been no showing of the requisite factual foundation. The prosecutor then sought to establish a foundation for admission of the statements directed solely at the question whether the *154 statements were excited utterances. At no point in the ensuing examination was the officer asked any questions concerning whether the victim expressed a belief that his death was imminent or was told that he was likely to die from his wound.[19] That is, the prosecutor clearly abandoned any effort to establish even a minimally sufficient foundation for the dying declaration exception, and limited his further questions exclusively to the excited utterance exception. The district court then ruled that the statements were admissible excited utterances, but did not address whether they were also dying declarations. The district court’s original ruling that there was not a sufficient foundational basis to conclude that the statements were dying declarations was never appealed or reversed.
Indeed, the prosecutor essentially conceded during the following exchange at the pretrial conference that the victim’s statements to the police were not dying declarations:
The Court: I guess we have two issues ultimately, whether it comes in as a dying declaration or whether it comes in as an excited utterance. Is that where we are?
The Prosecutor: The issue is not whether it comes in as one or the other. It came in at the [preliminary] exam clearly as an excited utterance. I think that’s the way it’s *155 going to be at trial because I think there’s going to be a lack of proof on whether the deceased knew he was dying at the time. [Emphasis added.]
In addition, at the suppression hearing, the prosecutor stated:
[The victim], as we know, unlike what the officers knew that night, but what we know now is that [the victim] ended up dying of his injuries. He himself, [the victim], may not have known that at the time.
During the prosecutor’s closing statement to the jury, the prosecutor again said:
[The victim] ended up dying several hours later. We don’t know whether he knew that at the time he said this....
Because a dying declaration must be made while the declarant believes his death to be imminent, and the prosecutor stated that there is a “lack of proof on whether the deceased knew he was dying at the time,” the prosecutor seems to have conceded that the victim’s statements were not dying declarations.[20]
*156 The circuit court also believed that the prosecutor had abandoned the dying declarations issue when, in response to defendant’s request that the prosecutor refrain from referring to the victim’s statements as the dying victim’s statements during closing arguments, the circuit court stated:
I think maybe based upon an attorney’s knowledge of the difference between dying declaration[s] and excited utterance[s], dying declarations have a[] [greater] aura [of] reliability than excited utterances. This was not a dying declaration. It did not come in as a dying declaration, and I’m going to agree with Defense counsel on this one. That should not be characterized as, he lay there dying.... That’s pure supposition.
The prosecutor did not contest the circuit court’s ruling that the victim’s statement was not a dying declaration. In fact, during his closing argument, the prosecutor told the jury that the victim’s statements to the police were admissible under the excited utterance exception to the hearsay rule; the prosecutor did not refer to the dying declaration exception. Finally, the prosecutor did not raise this issue in the Court of Appeals or this Court until after this Court granted leave to appeal limited to the issue whether the victim’s statements constituted testimonial hearsay under Crawford and Davis. Accordingly, the prosecutor has either effectively conceded that the victim’s statements did not constitute a dying *157 declaration or, at the very least, has abandoned this issue. See Gross v Gen Motors Corp, 448 Mich 147, 162 n 8; 528 NW2d 707 (1995) (stating that “[w]hen a cause of action is presented for appellate review, a party is bound to the theory on which the cause was prosecuted or defended in the court below” and “[f]ailure to properly brief an issue on appeal constitutes abandonment of the question”).
IV CONCLUSION
Because the victim’s statements to the police were inadmissible testimonial hearsay statements pursuant to Crawford and Davis, and the admission of the statements constituted plain error requiring reversal, we reverse the Court of Appeals and remand this case for a new trial.
Kelly, C.J., and Cavanagh and Hathaway, JJ., concurred with Markman, J.

 Defendant, whose name is Richard, goes by the name “Rick,” and the victim told the police that “Rick” shot him.

 The jury acquitted defendant of first-degree murder.

 The trial court’s decision predated the United States Supreme Court’s decisions in Crawford and Davis. The trial court denied defendant’s motion to suppress the victim’s statements to the police, holding that these statements were admissible under the excited utterance exception to the hearsay rule, MRE 803(2).

 The Michigan Constitution also guarantees criminal defendants the right “to be confronted with the witnesses against him or her ... .” Const 1963, art 1, § 20.

 Although the focus here is on the statements made by the declarant to the interrogators, the interrogators’ questions would nevertheless seem to provide necessary context in understanding the “primary purpose” of these statements.

 The prosecutor argues that the victim’s statements to the police are admissible because they fall within the excited utterance exception of MRE 803(2). However, this argument is clearly incompatible with the United States Supreme Court’s decision in Crawford. As that Court indicated, “Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment’s protections to the vagaries of the rules of evidence ....” Crawford, 541 US at 61. Instead, “[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.” Id. at 68-69. See, also, McCormick, Evidence (6th ed), § 252, p 163, citing Crawford, 541 US at 59 n 8 (“While . .. [the Crawford Court] suggested that dying declarations might be excepted for historical reasons, the Court took a different view of excited utterances (also known as spontaneous declarations).”).

 In its first opinion, the Court of Appeals stated, “The one question asked by the police — ‘what happened?’ — does not constitute an interrogation and there is no evidence of interrogation.” Bryant, supra at 2. In its second opinion, however, the Court of Appeals recognized that the police had, in fact, asked the victim multiple questions and that the victim’s statements were “made in the course of a police interrogation.” Bryant (On Remand), supra at 3. Indeed, the police admittedly asked defendant a “series of questions.” In its second opinion, the Court of Appeals stated, “The questioning was used to establish ... whether the shooter ... followed [the victim] to the gas station . ...” Id. However, none of the officers testified that they ever asked the victim whether the shooter followed the victim to the gas station or any similar questions.

 The dissent contends that the “time lapse” between the shooting and the questioning does not necessarily mean that the emergency was not ongoing when the questioning occurred. Post at 160. However, the dissent overlooks that part of Davis, 647 US at 828-829, in which the Supreme Court concluded that once the defendant had stopped assaulting the victim and left the scene of the crime, the “ongoing emergency” was over. Applying that same reasoning to the instant case, the “ongoing emergency,” at least in the Davis sense, was over once the victim was able to escape from defendant and drive six blocks to the gas station.

 The fact that Davis held that the pertinent question is the statement’s “primary purpose,” rather than its “sole purpose,” suggests that statements may be considered testimonial even though the statements may to some extent “enable police assistance to meet an ongoing emergency.” However, this matter need not be amplified upon in the present case.

 Davis explained that “police conduct [cannot] govern the Confrontation Clause; testimonial statements are what they are.” Davis, 547 US at 832 n 6. “Their saying that an emergency exists cannot make it be so.” Id. In the instant case, the police conduct (although not dispositive) does not even remotely suggest that the police believed that an ongoing emergency existed while they were interrogating the victim at the gas station.

 Contrary to the dissent’s contention, post at 160 n 1, the police were specifically asked these types of questions. For example, one officer was asked, “When your partner parked the car, what did you do?” to which he responded, “I got out of the vehicle and I went towards [the victim].” This officer was then asked if he went “immediately” to the victim and the officer responded, “Yes, I did.” This officer was then asked, “You didn’t go into the [gas] station and ask what had happened or anything like that,” to which he responded, “Negative, no.” Then, the officer was asked, “What did [your partner] do upon parking the car?” to which he said, “He got out of the vehicle too [and walked] towards [the victim].” The officer was then asked, “While you’re talking to [the victim], where is [your partner]?” to which he responded, "He was right there with me.” The officer was also asked whether he was standing or kneeling, and he indicated that he was standing. Another officer was asked, “Where did [the officers] go” when they got out of their vehicles, and he indicated that they “all went to [the victim].” Yet another officer was asked, “Where were [the other officers] when you arrived?” and he responded, “They were by [the victim].” This officer was then asked whether he “went straight to [the victim] or did. .. something else,” to which he responded, “I went straight to [the victim].” Then, this officer was asked, “You mean the entire time you were there you spent that entire time talking with [the victim], is that what you’re saying,” and he said, “The majority of the time there I did, yes.” Another officer was asked, “So you get there and there’s already two [sic] officers over near [the victim] on the ground and so you go over there also, correct,” to which he responded, "Correct.” This officer was then asked, “You didn’t look around and say, gee, there might be a shooter around here, I better keep an eye open,” to which he said, “I did not, no.” Finally, another officer was asked, “And when you got there at the gas station what did you, what’s the first thing you did?” to which he responded, “I approached the subject, the victim ... on the ground and asked him something like what happened.” This officer was then asked, “Did your partner go with you?” and he responded, “Yes. Yes. He followed right behind me.”

 Some of the officers actually left the gas station to proceed to defendant’s house even before EMS arrived. The dissent contends that the fact that the police called for backup assistance when they reached defendant’s house indicates that there was an “ongoing emergency.” Post at 160 n 1. Even if there was an “ongoing emergency” at defendant’s house (which we do not concede since defendant was not even at his house when the police arrived), this “ongoing emergency” existed at defendant’s house, not at the gas station at which the statements were made. Further, referring to the police investigation at defendant’s house as an “ongoing emergency” for purposes of evaluating an alleged Crawford violation is inconsistent with Davis, 547 US at 828-829, as the Court concluded in that case that once the defendant had stopped beating the victim and left the premises, the “ongoing emergency” had ended, despite the fact that a dangerous criminal remained on the run. Under the dissent’s approach, if there is an “ongoing emergency” anywhere (or even what the police perceive to be such an “ongoing emergency”), a victim’s statements to the police are to be considered non-testimonial even if those statements are made away from the actual venue of this “ongoing emergency.”

 In Davis, 547 US at 828, the Court discussed King v Brasier, 1 Leach 199, 168 Eng Rep 202 (1779), in which “a young rape victim, ‘immediately on her coming home, told all the circumstances of the injury’ to her *147 mother.” Davis stated that “if the relevant statement had been the girl’s screams for aid as she was being chased by her assailant,” the statement would have been non-testimonial. Davis, 547 US at 828. “But by the time the victim got home, her story was an account of past events,” and, thus, the victim’s statement to her mother was testimonial. Id.

 The dissent contends that we must consider the “length of time between [the] initial event and [the] police questioning.” Post at 161 n 2. Presumably, the shorter the time between the event and the questioning, the more likely that the statement should be considered non-testimonial. However, the United States Supreme Court has not directed us to consider the “length of time between [the] initial event and [the] questioning.” Instead, it has directed us to consider whether the statements describe an event as it is “actually happening,” or whether they describe an event that has already “happened.” Davis, 547 US at 827. If the statements fall in the former category they are to be considered non-testimonial and if they fall in the latter category they are to be considered testimonial, says the Supreme Court. Id. Although the dissent may refer to this as an “artificial threshold,” post at 161, it is, for better or worse, the “threshold” set by the Supreme Court, and is thus the threshold that we must follow here.

 Just as Davis was not referring to any “ongoing emergency” occurring anywhere, see note 12 of this opinion, it was also obviously not *150 referring to every imaginable type of “ongoing emergency.” Instead, given that Davis concluded that the statements made while the victim was being assaulted did occur during an “ongoing emergency,” but the statements made after the defendant stopped assaulting the victim and left the premises did not occur during an “ongoing emergency,” it is clear that Davis used the term “ongoing emergency” in reference to the emergency presented by the pendency of the criminal event itself, not by its aftermath, including the purely medical aftermath. Davis, 547 US at 828-829.

 Both the prosecutor and the dissent argue that the instant case is distinguishable from Crawford because the Crawford interrogation was more formal, i.e., the interrogation was tape-recorded and it took place at a police station. However, Davis expressly stated that the protections of the Confrontation Clause are not limited to statements made during formal interrogations. Davis, 547 US at 830. Further, we find it particularly telling that the three similarities between the instant case and Hammon that are listed directly above are the exact same three similari *151 ties that the United States Supreme Court relied on to conclude that Hammon is significantly similar to Crawford. Id.

 Before Crawford, as long as the hearsay statement was admissible under a “firmly rooted” hearsay exception, its admission did not violate the Confrontation Clause, Ohio v Roberts, 448 US 56, 66; 100 S Ct 2531; 65 L Ed 2d 597 (1980), and the excited utterance exception is a “firmly rooted” hearsay exception, White v Illinois, 502 US 346, 355-356 n 8; 112 S Ct 736; 116 L Ed 2d 848 (1992). Because this was the state of the law when the trial occurred in this case, defendant’s objection on the basis that the statements were not excited utterances, but not on the basis of a Confrontation Clause violation, was completely reasonable. Therefore, defendant cannot be faulted for failing to raise the Confrontation Clause issue at the trial. The prosecutor himself seems to agree:
Given the importance of resolving this point of law to the jurisprudence of this state, the People see no reason to quibble about the adequacy of Defendant’s presentation of the issue to the trial court. The trial in this matter preceded Crawford by more than a year, and trial counsel’s motion in limine was adequate to place the admissibility of the testimony at issue.

 In Crawford, 541 US at 56 n 6, the Supreme Court recognized that “[a]¡though many dying declarations may not be testimonial, there is authority for admitting even those that clearly are.” However, the Court concluded that “[w]e need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations,” but “[i]f this exception must be accepted on historical grounds, it is sui generis.” Id. In Giles v California, 554 US_; 128 S Ct 2678, 2682; 171 L Ed 2d 488 (2008), the Supreme Court quoted Crawford, 541 US at 54, for the proposition that “the Confrontation Clause is ‘most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding.’ ” It then noted in dictum that one of the “forms of testimonial statements [that] were admitted at common law even though they were unconfronted” were dying declarations. Id.

 MRE 804(b) provides, in pertinent part:
The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
(2) In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that the declarant’s death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death.

 The dissent contends, “The statements in this case seem admissible as dying declarations, thus potentially obviating much of the majority’s analysis.” Post at 158. We must point out initially that the United States Supreme Court has not yet held that dying declarations are admissible under Crawford. More significantly, however, and contrary to the dissent’s contention, the prosecutor did more than merely fail to “establishO the requisite foundation for a dying declaration,” post at 164 n 5; rather, he failed to appeal the district court’s decision that the statement was not a dying declaration, and he explicitly conceded that there is a “lack of proof on whether the deceased knew he was dying at the time.” In addition, even after Crawford and Davis were decided, the prosecutor still did not raise the dying declarations issue either with the Court of Appeals or with this Court until after this Court granted leave to appeal. On the other hand, defendant consistently argued that the victim’s statements were inadmissible and that they were not dying declarations. In fact, when the district court ruled that the victim’s statements were admissible, defendant asked the district court to clarify whether they *156 were admissible as dying declarations or as excited utterances. In addition, during the trial, defendant asked the circuit court to ensure that the prosecutor refrain from referring to the victim’s statements as the “dying victim’s statements.” While defendant did everything he could to ensure that the victim’s statements were not admitted as dying declarations, the prosecutor did nothing equivalent to seek admission of the statements as dying declarations, and essentially conceded that the statements were not dying declarations. Therefore, to answer the dissent’s question, post at 166, this is why we do “not [now] give the parties the same consideration” with regard to this issue.