IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 77071-3-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| JOSEPH M. ELDRIDGE, | ) | UNPUBLISHED OPINION |
| Appellant. | ) | FILED: June 3, 2019 |

SMITH, J. — Joseph Eldridge appeals his conviction for fourth degree assault—domestic violence against his wife, R.E., who did not testify at trial. He argues both that the trial court violated his Sixth Amendment confrontation right by admitting R.E.'s statements to a police officer describing the assault and that defense counsel was ineffective for failing to object to the statements on confrontation grounds. Because Eldridge's counsel did not object to the statements on confrontation grounds, we hold that Eldridge waived his right to challenge their admission on appeal. But we agree that defense counsel's failure to object on confrontation grounds was deficient because such an objection would likely have been sustained by the trial court. And Eldridge was prejudiced by counsel's failure to object because R.E.'s statements were the only evidence presented that Eldridge committed the assault. Therefore, we hold that defense counsel was ineffective and we reverse and remand for a new trial.

## FACTS

On February 5, 2015, someone called 911 from the Eldridge home and hung up. The 911 operator called back, but the person who answered hung up again. Snohomish County Sheriff's Deputy Arthur Wallin arrived to the house "within a couple minutes" of the 911 call. As he walked up to the house, he observed R.E., who was holding some papers, come out of the garage and approach a car in the driveway. R.E. was "upset," "[a]ppeared to be crying or recently crying" and was "visibly shaking." Deputy Wallin asked R.E. "what had happened" and she responded, "'[h]e did this to me.'" Deputy Wallin then "[h]ad a conversation with" R.E. in which she explained that she and Eldridge got into an argument about the papers she was holding, an altercation occurred, she attempted to call 911, and Eldridge took the phone away from her. Deputy Wallin observed a red mark on R.E.'s chest and took photographs of her injury. Deputy Wallin asked the dispatcher to attempt to locate Eldridge, who R.E. believed was driving to work on Interstate 405. Deputy Wallin did not call a medic. R.E. completed and signed a witness statement under penalty of perjury.

The State charged Eldridge with one count of fourth degree assault—domestic violence and one count of interfering with domestic violence reporting. R.E. did not testify at trial, but Deputy Wallin testified as to the above facts. Defense counsel objected to Deputy Wallin's account of R.E.'s statements on hearsay grounds, but the district court admitted the testimony under the excited utterance exception.

A jury found Eldridge guilty of assault—domestic violence and not guilty of interfering with domestic violence reporting.

Eldridge appealed his conviction to the Snohomish County Superior Court, arguing that the district court violated his confrontation rights by admitting R.E.'s statements. The superior court affirmed the conviction, and we granted discretionary review.

## ADMISSION OF OUT-OF-COURT STATEMENTS

Eldridge argues that the admission of R.E.'s out-of-court statements violated his federal and state constitutional right to confrontation, even if the trial court properly admitted them as a hearsay exception. But because he did not object to the admission of those statements on confrontation grounds at trial, he waived any challenge to their admission on appeal.

Under the Sixth Amendment, a defendant has the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. Article I, section 22 of the Washington State Constitution similarly guarantees a defendant the right to "to meet the witnesses against him face to face." But a defendant waives these rights by not objecting at trial. State v. Burns, ___ Wn.2d ___, 438 P.3d 1183, 1190 (2019). RAP 2.5(a)(3) allows a defendant to raise a "manifest error affecting a constitutional right" for the first time on appeal. But the Washington Supreme Court has held that in the context of a confrontation clause violation, "[w]here a defendant does not object at trial, 'nothing the trial court does or fails to do is a denial of the right, and if there is no denial of a right, there is no error by the trial court, manifest or otherwise, that an appellate court can review.'"

3

Burns, 438 P.2d at 1193 (quoting State v. Fraser, 170 Wn. App. 13, 25-26, 282 P.3d 152 (2012)).

Here, Eldridge did not object to the admission of R.E.'s statements on confrontation grounds, only on hearsay grounds. Therefore, he waived his right to challenge the admission of those statements on appeal based on the confrontation clause.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Eldridge argues that defense counsel was ineffective in failing to object to the admission of R.E.'s statements on confrontation grounds because those statements violated his Sixth Amendment confrontation right. We agree.[1]

To prevail on a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced him. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." State v. Madison, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). We review claims of ineffective assistance of counsel de novo. State v. Estes, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017).

Here, defense counsel's failure to object to the admission of R.E.'s statements on confrontation grounds was both deficient and prejudicial.

---

[1] Based on this conclusion, we need not address Eldridge's argument that the admission of R.E.'s statements also violated article I, section 22 of the Washington State Constitution.

4

*Deficient Performance*

Eldridge argues that defense counsel's performance was deficient because an objection to R.E.'s statements would likely have been sustained. We hold that R.E.'s initial statement that "'[h]e did this to me'" was nontestimonial and therefore an objection on confrontation grounds would have failed. But, we agree with Eldridge that an objection to R.E.'s remaining statements would likely have been sustained because the statements were testimonial and inadmissible under the Sixth Amendment.

"Performance is deficient if it falls 'below an objective standard of reasonableness based on consideration of all the circumstances.'" Estes, 188 Wn.2d at 458 (quoting McFarland, 127 Wn.2d at 334-35). We indulge a strong presumption that counsel's representation was reasonable and that performance is not deficient if counsel's conduct can be characterized as legitimate trial strategy or tactics. Estes, 188 Wn.2d at 458. "Where a claim of ineffective assistance of counsel rests on trial counsel's failure to object, a defendant must show that an objection would likely have been sustained." State v. Fortun-Cebada, 158 Wn. App. 158, 172, 241 P.3d 800 (2010). "[T]here is no ineffectiveness if a challenge to admissibility of evidence would have failed." State v. Nichols, 161 Wn.2d 1, 14-15, 162 P.3d 1122 (2007).

Under the Sixth Amendment's confrontation clause, "testimonial" hearsay is inadmissible in criminal trials unless the declarant is "unavailable to testify, and the defendant had . . . a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

5

Here, the State does not dispute that R.E. was available to testify and that Eldridge had no prior opportunity to cross-examine her. Therefore, the issue on appeal is whether the trial court likely would have excluded R.E.'s statements as inadmissible "testimonial" hearsay had defense counsel objected on that ground.

In Crawford, the United States Supreme Court defined "testimony" as "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" Crawford, 541 U.S. at 51 (alteration in original) (quoting 2 N. Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). Even so, the Court expressly declined to expand on what statements are considered "testimonial." Crawford, 541 U.S. at 68. In Davis v. Washington, the Court addressed this uncertainty by creating the "primary purpose" test. 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). That test distinguishes between testimonial and nontestimonial witness statements by assessing whether the primary purpose of the interrogation is to enable police to address an ongoing emergency or to establish past criminal events:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis, 547 U.S. at 822. The primary purpose of an interrogation may at first be to determine the need for emergency assistance but evolve into one designed to establish past events once the officer determines the emergency has ended. Davis, 547 U.S. at 828. To that end, whether an ongoing emergency exists at

6

the time a statement is made is determined by an objective evaluation of "the circumstances in which the encounter occurs and the statements and actions of the parties." Michigan v. Bryant, 562 U.S. 344, 359, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011).

In determining the primary purpose of an interrogation, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Bryant, 562 U.S. at 360. In other words, admissibility depends on whether "in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" Ohio v. Clark, __ U.S. __, 135 S. Ct. 2173, 2180, 192 L. Ed. 2d 306 (2015) (alteration in original) (quoting Bryant, 562 U.S. at 358).

Two United States Supreme Court cases are instructive here: Davis and Bryant. In Davis, the Court examined two state court convictions: State v. Davis, 154 Wn.2d 291, 111 P.3d 844 (2005), aff'd, 547 U.S. 813, 126 S. Ct. 2266, 1965 L. Ed. 2d 224 (2006), and Hammon v. State, 829 N.E.2d 444 (Ind. 2005), rev'd, 547 U.S. 813, 126 S. Ct. 2266, 1965 L. Ed. 2d 224 (2006), and came to opposite conclusions. The Court first discussed Davis, where Michelle McCottry called 911 and told the operator that her ex-boyfriend, Adrian Davis, had just assaulted her. Davis, 547 U.S. at 817. Shortly thereafter, McCottry told the operator that Davis was leaving. Davis, 547 U.S. at 818. Four minutes later, officers arrived at

7

McCottry's house and found her shaken and preparing to leave. Davis, 547 U.S. at 818. At Davis's trial for felony violation of a domestic no-contact order, McCottry did not testify, but the court admitted her 911 call over Davis's objection. Davis, 547 U.S. at 818-19. A jury convicted Davis, and he appealed. Davis, 547 U.S. at 819. The United States Supreme Court affirmed, holding that McCottry's statements during the 911 call were nontestimonial and therefore admissible. Davis, 547 U.S. at 828, 834. The Court concluded that McCottry made her statements for the primary purpose of obtaining police assistance to deal with an ongoing emergency rather than to establish the facts of a past crime. Davis, 547 U.S. at 826-29. The Court reached its conclusion by considering four factors. First, McCottry described events during the phone call as they were happening, rather than some time after the fact. Davis, 547 U.S. at 827. Second, the Court determined that any objective listener would understand that McCottry faced a real and ongoing emergency because Davis posed an immediate and "bona fide physical threat" to McCottry. Davis, 547 U.S. at 827, 831. Third, the Court held that the questions the 911 operator asked, including those necessary to determine Davis's identity and to evaluate the threat that he posed, were necessary to resolve the emergency. Davis, 547 U.S. at 827. Finally, the Court held that the informality of McCottry's interaction with the 911 operator (a frantic call over the phone in an unsafe environment) indicated she was not making testimonial statements. Davis, 547 U.S. at 827.

In contrast, in the Hammon case, the United States Supreme Court determined that the primary purpose of the out-of-court statements at issue was

8

to establish the facts of a past crime. There, police responded to a domestic violence call and found Hershel Hammon's wife sitting on her porch. Davis, 547 U.S. at 819. She appeared frightened, but told the police that "'nothing was the matter.'" Davis, 547 U.S. at 819 (internal quotation marks omitted) (quoting Hammon, 829 N.E.2d at 447). Hammon's wife gave the police permission to enter the house, where they saw a broken heater surrounded by pieces of glass. Davis, 547 U.S. at 819. The police then questioned her in the living room while Hammon was in the kitchen. Davis, 547 U.S. at 819. Hammon told the officers what happened and then filled out and signed a battery affidavit, which stated that her husband had broken the heater and then shoved her into the pieces of glass, beat her, attacked her daughter, and destroyed some of her property. Davis, 547 U.S. at 820. The State charged Hammon with domestic battery and violating his probation. Davis, 547 U.S. at 820. At trial, Hammon's wife did not appear and the court admitted an officer's testimony as to her statements to him over defense counsel's objections. Davis, 547 U.S. at 820. A judge convicted Hammon on both charges. Davis, 547 U.S. at 821. Hammon appealed, and the United States Supreme Court reversed the conviction, holding his wife's statements were testimonial and inadmissible. Davis, 547 U.S. at 821, 830, 834. First, there was no ongoing emergency because the police heard no one arguing or breaking things and Hammon's wife confirmed there was no immediate threat when she initially said that "things were fine." Davis, 547 U.S. at 829-30. Second, the officers' questions sought to determine "'what happened,'" not "'what is happening.'" Davis, 547 U.S. at 830 (emphasis added). Finally, Hammon's

9

wife's interaction with officers was "formal enough." Davis, 547 U.S. at 830. They separated her from her husband and used her responses, which described "how potentially criminal past events began and progressed," in their "'investigat[ion].'" Davis, 547 U.S. at 830 (alteration in original).

Finally, in Bryant, police asked Anthony Covington, a man dying from a gunshot wound at a gas station, "'what had happened, who had shot him, and where the shooting had occurred.'" Bryant, 562 U.S. at 349 (quoting People v. Bryant, 483 Mich. 132, 143, 768 N.W. 2d 65 (2009)). Covington told them that about half-an-hour earlier, he spoke with Bryant through the back door to Bryant's house. Bryant, 562 U.S. at 349. When Covington turned to leave, Bryant shot Covington through the door and Covington then drove to the gas station. Bryant, 562 U.S. at 349. After emergency medical services arrived to treat Covington, police went to Bryant's house and found blood, a bullet, a bullet hole in the door, and Covington's wallet. Bryant, 562 U.S. at 349-50. A jury convicted Bryant of murder and other firearm charges after the police officers testified about Covington's statements. The Michigan Supreme Court eventually reversed his convictions. Bryant, 562 U.S. at 350. The United States Supreme Court vacated and remanded the Michigan court's decision, holding Covington's statements were nontestimonial and Bryant's conviction should stand. Bryant, 562 U.S. at 348-49. Applying Davis, the Court noted that although Bryant shot Covington more than 25 minutes before police interrogated Covington, Bryant remained at large while Covington spoke to the police. Bryant, 562 U.S. at 376-77. Given Bryant's unknown location and Covington's medical condition, the

10

Court concluded that any objective listener would realize that Covington faced an ongoing emergency when he spoke to the police. Bryant, 562 U.S. at 375. Furthermore, the police officers' questions "were the exact type of questions necessary" to assess the existing threats to their own safety and Covington's safety. Bryant, 562 U.S. at 376. Finally, the Court noted that Covington's interaction with police, occurring in a fluid and confused scene and in an unstructured way, lacked the formality associated with testimony. Bryant, 562 U.S. at 377.

The Washington Supreme Court has drawn from Davis four factors to determine whether the "primary purpose" of a police interrogation is to enable assistance to meet an ongoing emergency:

> (1) Was the speaker speaking about current events as they were actually occurring, requiring police assistance, or was he or she describing past events? . . . (2) Would a "reasonable listener" conclude that the speaker was facing an ongoing emergency that required help? . . . (3) What was the nature of what was asked and answered? . . . [and] (4) What was the level of formality of the interrogation?

State v. Koslowski, 166 Wn.2d 409, 418-19, 209 P.3d 479 (2009). Applying the Davis factors to this record, we hold that R.E.'s initial statement to Deputy Wallin that "'[h]e did this to me'" was nontestimonial and, therefore, admissible. But we also hold that R.E.'s subsequent statements identifying Eldridge and describing the assault were testimonial and that had defense counsel objected on confrontation grounds, the trial court likely would have sustained the objection.

Under the first Davis factor, it is more likely that the primary purpose of a police interrogation is to respond to an ongoing emergency if the witness is

narrating ongoing events rather than past events. Here, unlike the statements to the 911 operator in Davis, all of R.E.'s statement to Deputy Wallin, including her statement that "'[h]e did this to me,'" described past events, not ongoing ones. As a result, this interrogation is more akin to Hammon's wife's interrogation.

The second Davis factor considers whether an objective listener would recognize that the witness faced an ongoing emergency and, if so, the statements are more likely to be nontestimonial. This evaluation "is a highly context-dependent inquiry." Bryant, 562 U.S. at 363. Here, an objective listener would recognize that R.E. faced an ongoing emergency when she first spoke to Deputy Wallin. Specifically, Deputy Wallin explained at trial that police officers responding to a 911 hang-up call do not know what to expect upon arrival. The call may turn out to be nothing, but it may also occur during the course of a serious crime. Here, Deputy Wallin did not have any information about what prompted the 911 call or whether there was a continuing threat at the residence. He approached the house and saw R.E. come out of the garage upset, crying, and shaking. Therefore, a reasonable listener would conclude when Deputy Wallin asked R.E. "what had happened," he was trying to ascertain whether there was an ongoing emergency that required help.

The record does not include the exact timeline of the interrogation, after this initial exchange. Rather, Deputy Wallin testified in very general terms that he and R.E. "[h]ad a conversation" in which he learned that Eldridge pushed R.E. against the fridge or the wall and caused a red mark on her chest. Deputy Wallin did not testify that R.E. expressed any fear that Eldridge was still in the residence

or that Eldridge would return. He also did not testify that R.E. appeared to need medical assistance or requested it. At some point in the conversation, R.E. told Deputy Wallin that she believed Eldridge was driving to work on Interstate 405. Given this limited record, a reasonable listener would conclude that because R.E. did not request assistance or need medical attention and because Eldridge was no longer at the home or posing a current threat to R.E., there was no longer an ongoing emergency.

The third Davis factor considers whether the questions asked and the witness's responses were necessary to resolve an ongoing emergency. If so, the responses are likely nontestimonial. The fact that police ask about the identity of the perpetrator or the facts of the crime does not necessarily make the witness's answers testimonial. Bryant, 562 U.S. at 376; Davis, 547 U.S. at 827. Rather, questions intended to allow the police to "assess the situation and the threat to the safety of the victim and themselves" may elicit nontestimonial answers. Koslowski, 166 Wn.2d at 425-26. Here, when Deputy Wallin asked R.E. what happened and she responded, "'[h]e did this to me,'" this question and answer were objectively necessary to resolve an emergency and were not merely intended to determine what happened in the past.

But, even though the record is limited, it indicates that at some point, R.E. and Deputy Wallin's conversation shifted from identifying whether there was an ongoing emergency to documenting past events. During the conversation, R.E. identified Eldridge as the "he" who assaulted her and indicated that Eldridge was not at the house. But Deputy Wallin also took pictures of R.E.'s injuries and the

13

documents she was holding and collected a written statement from her, which she signed under penalty of perjury. At oral argument, the State conceded that by the time the pictures and statement were collected, and possibly even before that, the primary purpose of the questions and responses shifted from responding to an ongoing emergency to documenting past events constituting a crime. While we need not decide exactly when the interrogation changed from nontestimonial to testimonial, we reject the State's contention that all facts describing the who, what, and when elements of the assault are by their nature nontestimonial because they are typically asked by 911 operators and first responders. See Davis, 547 U.S. at 832 (rejecting an implication that "virtually any 'initial inquiries' at the crime scene will not be testimonial"). Police officers soliciting testimonial statements from a witness also ask who, what, and when questions.

The final Davis factor considers the formality of the speaker's interactions with the police: the less formal the interaction, the more likely the statements are nontestimonial. The location of the interrogation, whether the speaker was questioned in the presence of others, and whether the speaker "deliberately recounted . . . how potentially criminal past events began and progressed" all inform the level of formality present. Davis, 547 U.S. at 830. Here, the conversation between R.E. and Deputy Wallin was not as formal as the station-house interview in Crawford. But neither did it involve a "harried 911 call" as in Davis, or the "somewhat confused" and "[un]structured interrogation" that occurred in Bryant. Bryant, 562 U.S. at 377. The interrogation occurred in the

14

driveway, when R.E. was alone with Deputy Wallin, and there was no indication that R.E. was in any danger. Additionally, Deputy Wallin collected photographs and a signed statement from R.E. during the interrogation. Like the interrogation in Hammon's case, R.E.'s conversation with Deputy Wallin was "formal enough." Davis, 547 U.S. at 830.

In conclusion, considering the Davis factors, we hold that R.E.'s first statement to Deputy Wallin that "'[h]e did this to me'" was nontestimonial because the primary purpose of the exchange was to allow Deputy Wallin to respond to an ongoing emergency. Any objection to this statement on confrontation grounds likely would not have been sustained and defense counsel was not deficient in failing to object on that basis.

But the limited record on appeal does not support a conclusion that the primary purpose of R.E.'s statements in the remainder of the conversation was to respond to an ongoing emergency. The State bears the burden at trial of establishing that statements are nontestimonial. State v. Hurtado, 173 Wn. App. 592, 600, 294 P.3d 838 (2013). Here, there is no indication that an objective listener would have recognized that R.E. faced an ongoing emergency after her initial exchange with Deputy Wallin or that the remainder of her conversation with Deputy Wallin was necessary to resolve such an emergency. Furthermore, R.E.'s statements described past events and the interrogation was more formal than informal. Therefore, the statements in the rest of the conversation were testimonial and their admission violated the confrontation clause. For that reason, we conclude that had defense counsel objected, the trial court likely

15

would have sustained an objection on this record. Additionally, defense counsel tried to exclude the statements on hearsay grounds, so his failure to object on confrontation grounds cannot be characterized as legitimate trial strategy or tactics. For these reasons, defense counsel's performance was deficient in failing to object to all but the first of R.E.'s statements to Deputy Wallin.

*Prejudice*

Eldridge argues that his counsel's deficient performance prejudiced him. We agree.

To establish prejudice, a defendant must show that there is a reasonable probability that the result of the trial would have been different absent the challenged conduct. Strickland, 466 U.S. at 694. Here, R.E.'s statements to Deputy Wallin identifying Eldridge and describing the circumstances of the assault were the only evidence presented at trial that Eldridge committed assault. Therefore, there is a reasonable probability that the jury would have acquitted Eldridge without that evidence. Eldridge has established prejudice.

We reverse and remand for a new trial.

WE CONCUR: