Justice Sotomayor
delivered the opinion of the Court.
At respondent Richard Bryant’s trial, the court admitted statements that the victim, Anthony Covington, made to police officers who discovered him mortally wounded in a gas station parking lot. A jury convicted Bryant of, inter alia, second-degree murder. 483 Mich. 132, 137, 768 N. W. 2d 65, 67-68 (2009). On appeal, the Supreme Court of Michigan held that the Sixth Amendment’s Confrontation Clause, as explained in our decisions in Crawford v. Washington, 541 U. S. 36 (2004), and Davis v. Washington, 547 U. S. 813 (2006), rendered Covington’s statements inadmissible testimonial hearsay, and the court reversed Bryant’s conviction. 483 Mich., at 157, 768 N. W. 2d, at 79. We granted the *349 State’s petition for a writ of certiorari to consider whether the Confrontation Clause barred the admission at trial of Covington’s statements to the police. We hold that the circumstances of the interaction between Covington and the police objectively indicate that the “primary purpose of the interrogation” was “to enable police assistance to meet an ongoing emergency.” Davis, 547 U. S., at 822. Therefore, Covington’s identification and description of the shooter and the location of the shooting were not testimonial statements, and their admission at Bryant’s trial did not violate the Confrontation Clause. We vacate the judgment of the Supreme Court of Michigan and remand.
I
Around 3:25 a.m. on April 29, 2001, Detroit, Michigan, police officers responded to a radio dispatch indicating that a man had been shot. At the scene, they found the victim, Anthony Covington, lying on the ground next to his car in a gas station parking lot. Covington had a gunshot wound to his abdomen, appeared to be in great pain, and spoke with difficulty.
The police asked him “what had happened, who had shot him, and where the shooting had occurred.” 483 Mich., at 143, 768 N. W. 2d, at 71. Covington stated that “Rick” shot him at around 3 a.m. Id., at 136, and n. 1, 768 N. W. 2d, at 67, and n. 1. He also indicated that he had a conversation with Bryant, whom he recognized based on his voice, through the back door of Bryant’s house. Covington explained that when he turned to leave, he was shot through the door and then drove to the gas station, where police found him.
Covington’s conversation with the police ended within 5 to 10 minutes when emergency medical services arrived. Cov-ington was transported to a hospital and died within hours. The police left the gas station after speaking with Coving-ton, called for backup, and traveled to Bryant’s house. They *350 did not find Bryant there but did find blood and a bullet on the back porch and an apparent bullet hole in the back door. Police also found Covington’s wallet and identification outside the house.
At trial, which occurred prior to our decisions in Crawford, 541 U. S. 36, and Davis, 547 U. S. 813, the police officers who spoke with Covington at the gas station testified about what Covington had told them. The jury returned a guilty verdict on charges of second-degree murder, being a felon in possession of a firearm, and possession of a firearm during the commission of a felony.
Bryant appealed, and the Michigan Court of Appeals affirmed his conviction. No. 247039, 2004 WL 1882661 (Aug. 24, 2004) (per curiam). Bryant then appealed to the Supreme Court of Michigan, arguing that the trial court erred in admitting Covington’s statements to the police. The Supreme Court of Michigan eventually remanded the case to the Court of Appeals for reconsideration in light of our 2006 decision in Davis. 477 Mich. 902, 722 N. W. 2d 797 (2006). On remand, the Court of Appeals again affirmed, holding that Covington’s statements were properly admitted because they were not testimonial. No. 247039, 2007 WL 675471 (Mar. 6, 2007) (per curiam). Bryant again appealed to the Supreme Court of Michigan, which reversed his conviction. 483 Mich. 132, 768 N. W. 2d 65.
Before the Supreme Court of Michigan, Bryant argued that Covington’s statements to the police were testimonial under Crawford and Davis and were therefore inadmissible. The State, on the other hand, argued that the statements were admissible as “excited utterances” under the Michigan Rules of Evidence. 483 Mich., at 142, and n. 6, 768 N. W. 2d, at 70, and n. 6. There was no dispute that Covington was unavailable at trial and Bryant had no prior opportunity to cross-examine him. The court therefore assessed whether Covington’s statements to the police identifying and describ *351 ing the shooter and the time and location of the shooting were testimonial hearsay for purposes of the Confrontation Clause. The court concluded that the circumstances “clearly indicate that the ‘primary purpose’ of the questioning was to establish the facts of an event that had already occurred; the ‘primary purpose’ was not to enable police assistance to meet an ongoing emergency.” Id., at 143, 768 N. W. 2d, at 71. The court explained that, in its view, Covington was describing past events and as such, his “primary purpose in making these statements to the police .. . was ... to tell the police who had committed the crime against him, where the crime had been committed, and where the police could find the criminal.” Id., at 144, 768 N. W. 2d, at 71. Noting that the officers’ actions did not suggest that they perceived an ongoing emergency at the gas station, the court held that there was in fact no ongoing emergency. Id., at 145-147, 768 N. W. 2d, at 71-73. The court distinguished the facts of this case from those in Davis, where we held a declarant’s statements in a 911 call to be nontestimonial. It instead analogized this case to Hammon v. Indiana, which we decided jointly with Davis and in which we found testimonial a declarant’s statements to police just after an assault. See 547 U. S., at 829-832. Based on this analysis, the Supreme Court of Michigan held that the admission of Covington’s statements constituted prejudicial plain error warranting reversal and ordered a new trial. 483 Mich., at 151-153, 768 N. W. 2d, at 75-76. The court did not address whether, absent a Confrontation Clause bar, the statements’ admission would have been otherwise consistent with Michigan’s hearsay rules or due process.[1]
*352 The majority’s opinion provoked two dissents, both of which would have held Covington’s statements admissible because they were made in circumstances indicating that their “primary purpose” was to assist police in addressing an ongoing emergency. Id., at 157, 768 N. W. 2d, at 79 (opinion of Weaver, J.); id., at 157-159, 768 N. W. 2d, at 79 (opinion of Corrigan, J.). Justice Corrigan’s dissent explained that the time and space between “the onset of an emergency and statements about that emergency clearly must be considered in context.” Id., at 161, 768 N. W. 2d, at 80. Justice Corri-gan concluded that the objective circumstances of Coving-ton’s interaction with police rendered this case more similar to the nontestimonial statements in Davis than to the testimonial statements in Crawford. 483 Mich., at 164, 768 N. W. 2d, at 82.
We granted certiorari to determine whether the Confrontation Clause barred admission of Covington’s statements. 559 U. S. 970 (2010).
II
The Confrontation Clause of the Sixth Amendment states: “In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” The Fourteenth Amendment renders the Clause binding on the States. Pointer v. Texas, 380 U. S. 400, 403 (1965). In *353 Ohio v. Roberts, 448 U. S. 56, 66 (1980), we explained that the confrontation right does not bar admission of statements of an unavailable witness if the statements “bea[r] adequate ‘indicia of reliability.’ ” We held that reliability can be established if “the evidence falls within a firmly rooted hearsay exception,” or if it does not fall within such an exception, then if it bears “particularized guarantees of trustworthiness.” Ibid.
Nearly a quarter century later, we decided Crawford v. Washington, 541 U. S. 36. Petitioner Michael Crawford was prosecuted for stabbing a man who had allegedly attempted to rape his wife, Sylvia. Sylvia witnessed the stabbing, and later that night, after she and her husband were both arrested, police interrogated her about the incident. At trial, Sylvia Crawford claimed spousal privilege and did not testify, but the State introduced a tape recording of Sylvia’s statement to the police in an effort to prove that the stabbing was not in self-defense, as Michael Crawford claimed. The Washington Supreme Court affirmed Crawford’s conviction because it found Sylvia’s statement to be reliable, as required under Ohio v. Roberts. We reversed, overruling Ohio v. Roberts. 541 U. S., at 60-68; see also Davis, 547 U. S., at 825, n. 4.
Crawford examined the common-law history of the confrontation right and explained that “the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused.” 541 U. S., at 50. We noted that in England, pretrial examinations of suspects and witnesses by government officials “were sometimes read in court in lieu of live testimony.” Id., at 43. In light of this history, we emphasized the word “witnesses” in the Sixth Amendment, defining it as “those who ‘bear testimony.’” Id., at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). We defined “testimony” as “‘[a] solemn declaration or affirma *354 tion made for the purpose of establishing or proving some fact.’” 541 U.S., at 51 (quoting Webster). We noted that “[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.” Ibid. We therefore limited the Confrontation Clause’s reach to testimonial statements and held that in order for testimonial evidence to be admissible, the Sixth Amendment “demands what the common law required: unavailability and a prior opportunity for cross-examination.” Id., at 68. Although “leaving] for another day any effort to spell out a comprehensive definition of ‘testimonial,’ ” Crawford noted that “at a minimum” it includes “prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations.” Ibid. Under this reasoning, we held that Sylvia Crawford’s statements in the course of police questioning were testimonial and that their admission when Michael Crawford “had no opportunity to cross-examine her” due to spousal privilege was “sufficient to make out a violation of the Sixth Amendment.” Ibid.
In 2006, the Court in Davis v. Washington and Hammon v. Indiana, 547 U. S. 813, took a further step to “determine more precisely which police interrogations produce testimony” and therefore implicate a Confrontation Clause bar. Id., at 822. We explained that when Crawford said that
“ ‘interrogations by law enforcement officers fall squarely within [the] class’ of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial.” Davis, 547 U. S., at 826.
*355 We thus made clear in Davis that not all those questioned by the police are witnesses and not all “interrogations by law enforcement officers,” Crawford, 541 U. S., at 53, are subject to the Confrontation Clause.[2]
Davis and Hammon were both domestic violence cases. In Davis, Michelle McCottry made the statements at issue to a 911 operator during a domestic disturbance with Adrian Davis, her former boyfriend. McCottry told the operator, “'He’s here jumpin’ on me again,’” and, “'He’s usin’ his fists.’ ” 547 U. S., at 817. The operator then asked McCot-try for Davis’ first and last names and middle initial, and at that point in the conversation McCottry reported that Davis had fled in a car. Id., at 818. McCottry did not appear at Davis’ trial, and the State introduced the recording of her conversation with the 911 operator. Id., at 819.
In Hammon, decided along with Davis, police responded to a domestic disturbance call at the home of Amy and Hershel Hammon, where they found Amy alone on the front porch. Ibid. She appeared “'somewhat frightened,’” but told them “ ‘nothing was the matter.’” Ibid. (quoting Hammon v. State, 829 N. E. 2d 444, 446-447 (Ind. 2005)). She gave the police permission to enter the house, where they saw a gas heating unit with the glass front shattered on the floor. One officer remained in the kitchen with Hershel, while another officer talked to Amy in the living room about what had happened. Hershel tried several times to participate in Amy’s conversation with the police and became angry when the police required him to stay separated from Amy. 547 U. S., at 819-820. The police asked Amy to fill out and sign a battery affidavit. She wrote: “ ‘Broke our Furnace & *356 shoved me down on the floor into the broken glass. Hit me in the chest and threw me down. Broke our lamps & phone. Tore up my van where I couldn’t leave the house. Attacked my daughter.’” Id., at 820. Amy did not appear at Hershel’s trial, so the police officers who spoke with her testified as to her statements and authenticated the affidavit. Ibid. The trial court admitted the affidavit as a present sense impression and admitted the oral statements as excited utterances under state hearsay rules. Ibid. The Indiana Supreme Court affirmed Hammon’s conviction, holding that Amy's oral statements were not testimonial and that the admission of the affidavit, although erroneous because the affidavit was testimonial, was harmless. Hammon v. State, 829 N. E. 2d, at 458-459.
To address the facts of both cases, we expanded upon the meaning of “testimonial” that we first employed in Crawford and discussed the concept of an ongoing emergency. We explained:
“Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.” Davis, 547 U. S., at 822.
Examining the Davis and Hammon statements in light of those definitions, we held that the statements at issue in Davis were nontestimonial and the statements in Hammon were testimonial. We distinguished the statements in Davis from the testimonial statements in Crawford on several grounds, including that the victim in Davis was “speaking about events as they were actually happening, rather *357 than ‘describing] past events,” that there was an ongoing emergency, that the “elicited statements were necessary to be able to resolve the present emergency,” and that the statements were not formal. 547 U. S., at 827. In Hammon, ón the other hand, we held that, “[i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct.” Id., at 829. There was “no emergency in progress.” Ibid. The officer questioning Amy “was not seeking to determine . . . ‘what is happening/ but rather ‘what happened.’” Id., at 830. It was “formal enough” that the police interrogated Amy in a room separate from her husband where, “some time after the events described were over,” she “deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed.” Ibid. Because her statements “were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation,” id., at 832, we held that they were testimonial.
Davis did not “attemp[t] to produce an exhaustive classification of all conceivable statements — or even all conceivable statements in response to police interrogation — as either testimonial or nontestimonial.” Id., at 822.[3] The basic pur *358 pose of the Confrontation Clause was to “targe[t]” the sort of “abuses” exemplified at the notorious treason trial of Sir Walter Raleigh. Crawford, 541 U. S., at 51. Thus, the most important instances in which the Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial.[4] See id., at 43-44. Even where such an interrogation is conducted with all good faith, introduction of the resulting statements at trial can be unfair to the accused if they are untested by cross-examination. Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial. When, as in Davis, the primary purpose of an interrogation is to respond to an “ongoing emergency,” its purpose is not to create a record for trial and thus is not within the scope of the Clause. But there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay, designed to identify some state *359 ments as reliable, will be relevant. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.[5]
Deciding this case also requires further explanation of the “ongoing emergency” circumstance addressed in Davis. Because Davis and Hammon arose in the domestic violence context, that was the situation “we had immediately in mind (for that was the case before us).” 547 U. S., at 826. We now face a new context: a nondomestic dispute, involving a victim found in a public location, suffering from a fatal gunshot wound, and a perpetrator whose location was unknown at the time the police located the victim. Thus, we confront for the first time circumstances in which the “ongoing emergency” discussed in Davis extends beyond an initial victim to a potential threat to the responding police and the public at large. This new context requires us to provide additional clarification with regard to what Davis meant by “the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.” Id., at 822.
III
To determine whether the “primary purpose” of an interrogation is “to enable police assistance to meet an ongoing emergency,” ibid., which would render the resulting statements nontestimonial, we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties.
*360 A
The Michigan Supreme Court correctly understood that this inquiry is objective.[6] 483 Mich., at 142, 768 N. W. 2d, at 70. Davis uses the word “objective” or “objectively” no fewer than eight times in describing the relevant inquiry. See 547 U. S., at 822, 826-828, 830-831, and n. 5; see, e. g., id., at 826 (“The question before us in Davis, then, is whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements”). “Objectively” also appears in the definitions of both testimonial and nontestimonial statements that Davis established. Id., at 822.
An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the “primary purpose of the interrogation.” The circumstances in which an encounter occurs — e. g., at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards— are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals’ statements and actions and the circumstances in which the encounter occurred.[7]
*361 B
As our recent Confrontation Clause cases have explained, the existence of an “ongoing emergency” at the time of an encounter between an individual and the police is among the most important circumstances informing the “primary purpose” of an interrogation. See id., at 828-830; Crawford, 541 U. S., at 65. The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than “proving] past events potentially relevant to later criminal prosecution.”[8] Davis, 547 U. S., at 822. Rather, it focuses them on “end[ing] a threatening situation.” Id., at 832. Implicit in Davis is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination.
This logic is not unlike that justifying the excited utterance exception in hearsay law. Statements “relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition,” Fed. Rule Evid. 803(2); see also Mich. Rule Evid. 803(2) (2010), are considered reliable because the declarant, in the excitement, presumably cannot form a falsehood. See Idaho *362 v. Wright, 497 U. S. 805, 820 (1990) (“The basis for the 'excited utterance’ exception ... is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation ... ”); 5 J. Weinstein & M. Berger, Weinstein’s Federal Evidence § 803.04[1] (J. McLaughlin ed., 2d ed. 2010) (same); Advisory Committee’s Notes on Fed. Rule Evid. 803(2), 28 U. S. C. App., p. 371 (same). An ongoing emergency has a similar effect of focusing an individual’s attention on responding to the emergency.[9]
Following our precedents, the court below correctly began its analysis with the circumstances in which Covington interacted with the police. 483 Mich., at 143, 768 N. W. 2d, at 71. But in doing so, the court construed Davis to have decided more than it did and thus employed an unduly narrow understanding of “ongoing '‘emergency” that Davis does not require.
*363 First, the Michigan Supreme Court repeatedly and incorrectly asserted that Davis “defined” “‘ongoing emergency.’” 483 Mich., at 147, 768 N. W. 2d, at 73; see also id., at 144, 768 N. W. 2d, at 71-72. In fact, Davis did not even define the extent óf the emergency in that case. The Michigan Supreme Court erroneously read Davis as deciding that “the statements made after the defendant stopped assaulting the victim and left the premises did not occur during an ‘ongoing emergency.’ ” 483 Mich., at 150, n. 15, 768 N. W. 2d, at 75, n. 15. We explicitly explained in Davis, however, that we were asked to review only the testimonial nature of Michelle MeCottry’s initial statements during the 911 call; we therefore merely assumed the correctness of the Washington Supreme Court’s holding that admission of her other statements was harmless, without deciding, whether those subsequent statements were also made for the primary purpose of resolving an ongoing emergency. 547 U. S., at 829.
Second, by assuming that Davis defined the outer bounds of “ongoing emergency,” the Michigan Supreme Court failed to appreciate that whether an emergency exists and is ongoing is a highly context-dependent inquiry. See Brief for United States as Amicus Curiae 20. Davis and Hammon involved domestic violence, a known and identified perpetrator, and, in Hammon, a neutralized threat. Because Davis and Hammon were domestic violence cases, we focused only on the threat to the victims and assessed the ongoing emergency from the perspective of whether there was a continuing threat to them. 547 U. S., at 827, 829-830.
Domestic violence cases like Davis and Hammon often have a narrower zone of potential victims than cases involving threats to public safety. An assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue. See 483 Mich., at *364 164, 768 N. W. 2d, at 82 (Corrigan, J., dissenting) (examining the threat to the victim, police, and the public); Brief for United States as Amicus Curiae 19-20 (“An emergency-posed by an unknown shooter who remains at large does not automatically abate just because the police can provide security to his first victim”).
The Michigan Supreme Court also did not appreciate that the duration and scope of an emergency may depend in part on the type of weapon employed. The court relied on Davis and Hammon, in which the assailants used their fists, as controlling the scope of the emergency here, which involved the use of a gun. The problem with that reasoning is clear when considered in light of the assault on Amy Hammon. Hershel Hammon was armed only with his fists when he attacked his wife, so removing Amy to a separate room was sufficient to end the emergency. 547 U. S., at 830-832. If Hershel had been reported to be armed with a gun, however, separation by a single household wall might not have been sufficient to end the emergency. Id., at 819.
The Michigan Supreme Court’s failure to focus on the context-dependent nature of our Davis decision also led it to conclude that the medical condition of a declarant is irrelevant. 483 Mich., at 149, 768 N. W. 2d, at 74 (“The Court said nothing at all that would remotely suggest that whether the victim was in need of medical attention was in any way relevant to whether there was an 'ongoing emergency’ ”). But Davis and Hammon did not present medical emergencies, despite some injuries to the victims. 547 U. S., at 818, 820. Thus, we have not previously considered, much less ruled out, the relevance of a victim’s severe injuries to the primary purpose inquiry.
Taking into account the victim’s medical state does not, as the Michigan Supreme Court below thought, “rende[r] non-testimonial” “all statements made while the police are questioning a seriously injured complainant.” 483 Mich., at 149, 768 N. W. 2d, at 74. The medical condition of the victim is *365 important to the primary purpose inquiry to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one. The victim’s medical state álso provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public.
As the Solicitor General’s brief observes, Brief for United States as Amicus Curiae 20, and contrary to the Michigan Supreme Court’s claims, 483 Mich., at 147, 768 N. W. 2d, at 73, none of this suggests that an emergency is ongoing in every place or even just surrounding the victim for the entire time that the perpetrator of a violent crime is on the loose. As we recognized in Davis, “a conversation which begins as an interrogation to determine the need for emergency assistance” can “evolve into testimonial statements.” 547 U. S., at 828 (internal quotation marks omitted). This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute. It could also occur if a perpetrator is disarmed, surrenders, is apprehended, or, as in Davis, flees with little prospect of posing a threat to the public. Trial courts can determine in the first instance when any transition from nontestimonial to testimonial occurs,[10] and exclude “the portions of any state *366 ment that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence.” Id., at 829.
Finally, our discussion of the Michigan Supreme Court’s misunderstanding of what Davis meant by “ongoing emergency” should not be taken to imply that the existence vel non of an ongoing emergency is dispositive of the testimonial inquiry. As Davis made clear, whether an ongoing emergency exists is simply one factor — albeit an important factor — that informs the ultimate inquiry regarding the “primary purpose" of an interrogation. Another factor the Michigan Supreme Court did not sufficiently account for is the importance of informality in an encounter between a victim and police. Formality is not the sole touchstone of our primary purpose inquiry because, although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to “establish or prove past events potentially relevant to later criminal prosecution,” id., at 822, informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent. Cf. id., at 826 (explaining that Confrontation Clause requirements cannot “readily be evaded” by the parties deliberately keeping the written product of an interrogation informal “instead of having the declarant sign a deposition”). The court below, however, too readily dismissed the informality of the circumstances in this case in a single brief footnote and in fact seems to have suggested that the encounter in this case was formal. 483 Mich., at 150, n. 16, 768 N. W. 2d, at 75, n. 16. As we explain further below, the questioning in this case occurred in an exposed, public area, prior to the arrival of emergency medical services, and in a disorganized fashion. All of those facts make this case distinguishable from the formal station-house interrogation in Crawford. See Davis, 547 U. S., at 827.
*367 C
In addition to the circumstances in which an encounter occurs, the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation. See, e. g., ibid. (“[T]he nature of what was asked and answered in Davis, again viewed objectively, was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn (as in Crawford) what had happened in the past” (first emphasis added)). The Michigan Supreme Court did, at least briefly, conduct this inquiry. 483 Mich., at 144-147, 768 N. W. 2d, at 71-73.
As the Michigan Supreme Court correctly recognized, id., at 140, n. 5, 768 N. W. 2d, at 69, n. 5, Davis requires a combined inquiry that accounts for both the declarant and the interrogator.[11] In many instances, the primary purpose of *368 the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers. To give an extreme example, if the police say to a victim, “Tell us who did this to you so that we can arrest and prosecute them,” the victim's response that “Rick did it” appears purely accusatory because by virtue of the phrasing of the question, the victim necessarily has prosecution in mind when she answers.
The combined approach also ameliorates problems that could arise from looking solely to one participant. Predominant among these is the problem of mixed motives on the part of both interrogators and declarants. Police officers in our society function as both first responders and criminal investigators. Their dual responsibilities may mean that they act with different motives simultaneously or in quick succession. See New York v. Quarles, 467 U. S. 649, 656 (1984) (“Undoubtedly most police officers [deciding whether to give Miranda warnings in a possible emergency situation] would act out of a host of different, instinctive, and largely unverifiable motives — their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect”); see also Davis, 547 U. S., at 839 (Thomas, J., concurring in judgment in part and dissenting in part) (“In many, if not most, cases where police respond to a report of a crime, whether pursuant to a 911 call from the victim or otherwise, the purposes of an interrogation, viewed from the perspective of the police, are both to respond to the emergency situation and to gather evidence”).
Victims are also likely to have mixed motives when they make statements to the police. During an ongoing emergency, a victim is most likely to want the threat to her and to other potential victims to end, but that does not necessarily mean that the victim wants or envisions prosecution of the assailant. A victim may want the attacker to be incapacitated temporarily or rehabilitated. Alternatively, a severely injured victim may have no purpose at all in answer *369 ing questions posed; the answers may be simply reflexive. The victim’s injuries could be so debilitating as to prevent her from thinking sufficiently clearly to understand whether her statements are for the purpose of addressing an ongoing emergency or for the purpose of future prosecution.[12] Taking into account a victim’s injuries does not transform this objective inquiry into a subjective one. The inquiry is still objective because it focuses on the understanding and purpose of a reasonable victim in the circumstances of the actual victim — circumstances that prominently include the victim’s physical state.
The dissent suggests, post, at 381-382, that we intend to give controlling weight to the “intentions of the police,” post, at 382. That is a misreading of our opinion. At trial, the de-clarant’s statements, not the interrogator’s questions, will be introduced to “establis[h] the truth of the matter asserted,” Crawford, 541 U. S., at 60, n. 9, and must therefore pass the Sixth Amendment test. See n. 11, supra. In determining whether a declarant’s statements are testimonial, courts should look to all of the relevant circumstances. Even Justice Scalia concedes that the interrogator is relevant to this evaluation, post, at 382, and we agree that “[t]he identity of an interrogator, and the content and tenor of his questions,” ibid., can illuminate the “primary purpose of the interrogation.” The dissent, see post, at 382-384, criticizes the complexity of our approach, but we, at least, are unwilling to sacrifice accuracy for simplicity. Simpler is not always better, and courts making a “primary purpose” assessment *370 should not be unjustifiably restrained from consulting all relevant information, including the statements and actions of interrogators.
Objectively ascertaining the primary purpose of the interrogation by examining the statements and actions of all participants is also the approach most consistent with our past holdings. E. g., Davis, 547 U. S., at 822-823, n. 1 (noting that “volunteered testimony” is still testimony and remains subject to the requirements of the Confrontation Clause).
IV
As we suggested in Davis, when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the “primary purpose of the interrogation” by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs. The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation.[13] As the context of this case brings into sharp relief, the existence and dura *371 tion of an emergency depend on the type and scope of danger posed to the victim, the police, and the public.
Applying this analysis to the facts of this case is more difficult than in Davis because we do not have the luxury of reviewing a transcript of the conversation between the victim and the police officers. Further complicating our task is the fact that the trial in this ease occurred before our decisions in Crawford and Davis. We therefore review a record that was not developed to ascertain the “primary purpose of the interrogation.”
We first examine the circumstances in which the interrogation occurred. The parties disagree over whether there was an emergency when the police arrived at the gas station. Bryant argues, and the Michigan Supreme Court accepted, 483 Mich., at 147, 768 N. W. 2d, at 73, that there was no ongoing emergency because “there . . . was no criminal conduct occurring. No shots were being fired, no one was seen in possession of a firearm, nor were any witnesses seen cowering in fear or running from the scene.” Brief for Respondent 27. Bryant, while conceding that “a serious or life-threatening injury creates a medical emergency for a victim,” id., at 30, further argues that a declarant’s medical emergency is not relevant to the ongoing emergency determination.
In contrast, Michigan and the Solicitor General explain that when the police responded to the call that a man had been shot and found Covington bleeding on the gas station parking lot, “they did not know who Covington was, whether the shooting had occurred at the gas station or at a different location, who the assailant was, or whether the assailant posed a continuing threat to Covington or others.” Brief for United States as Amicus Curiae 15; Brief for Petitioner 16; see also id., at 15 (“[W]hen an officer arrives on the scene and does not know where the perpetrator is, whether he is armed, whether he might have other targets, and whether the violence might continue at the scene or elsewhere, inter *372 rogation that has the primary purpose of establishing those facts to assess the situation is designed to meet the ongoing emergency and is nontestimonial”).
The Michigan Supreme Court stated that the police asked Covington, “what had happened, who had shot him, and where the shooting had occurred.” 483 Mich., at 143, 768 N. W. 2d, at 71. The joint appendix contains the transcripts of the preliminary examination, suppression hearing, and trial testimony of five officers who responded to the scene and found Covington. The officers' testimony is essentially consistent but, at the same time, not specific. The officers basically agree on what information they learned from Cov-ington, but not on the order in which they learned it or on whether Covington’s statements were in response to general or detailed questions. They all agree that the first question was “what happened?” The answer was either “I was shot” or “Rick shot me.”[14]
As explained above, the scope of an emergency in terms of its threat to individuals other than the initial assailant and victim will often depend on the type of dispute involved. Nothing Covington said to the police indicated that the cause of the shooting was a purely private dispute or that the threat from the shooter had ended. The record reveals little about the motive for the shooting. The police officers who spoke with Covington at the gas station testified that Cov-ington did not tell them what words Covington and Rick had *373 exchanged prior to the shooting.[15] What Covington did tell the officers was that he fled Bryant’s back porch, indicating that he perceived an ongoing threat.[16] The police did not know, and Covington did not tell them, whether the threat was limited to him. The potential scope of the dispute and therefore the emergency in this case thus stretches more broadly than those at issue in Davis and Hammon and encompasses a threat potentially to the police and the public.
This is also the first of our post-Crawford Confrontation Clause cases to involve a gun. The physical separation that was sufficient to end the emergency in Hammon was not necessarily sufficient to end the threat in this case; Coving-ton was shot through the back door of Bryant’s house. Bryant’s argument that there was no ongoing emergency because “[n]o shots were being flred,” Brief for Respondent 27, surely construes ongoing emergency too narrowly. An emergency does not last only for the time between when the assailant pulls the trigger and the bullet hits the victim. If an out-of-sight sniper pauses between shots, no one would *374 say that the emergency ceases during the pause. That is an extreme example and not the situation here, but it serves to highlight the implausibility, at least as to certain weapons, of construing the emergency to last only precisely as long as the violent act itself, as some have construed our opinion in Davis. See Brief for Respondent 23-25.
At no point during the questioning did either Covington or the police know the location of the shooter. In fact, Bryant was not at home by the time the police searched his house at approximately 5:30 a.m. 483 Mich., at 136, 768 N. W. 2d, at 67. At some point between 3 a.m. and 5:30 a.m., Bryant left his house. At bottom, there was an ongoing emergency here where an armed shooter, whose motive for and location after the shooting were unknown, had mortally wounded Covington within a few blocks and a few minutes of the location where the police found Covington.[17]
This is not to suggest that the emergency continued until Bryant was arrested in California a year after the shooting. Id., at 137, 768 N. W. 2d, at 67. We need not decide precisely when the emergency ended because Covington’s encounter with the police and all of the statements he made during that interaction occurred within the first few minutes of the police officers’ arrival and well before they secured the scene of the shooting — the shooter’s last known location.
We reiterate, moreover, that the existence vel non of an ongoing emergency is not the touchstone of the testimonial inquiry; rather, the ultimate inquiry is whether the “primary purpose of the interrogation [was] to enable police assistance to meet [the] ongoing emergency.” Davis, 547 U. S., at 822. We turn now to that inquiry, as informed by the circumstances of the ongoing emergency just described. The circumstances of the encounter provide important context for *375 understanding Covington’s statements to the police. When the police arrived at Covington’s side, their first question to him was “What happened?”[18] Covington’s response was either “Rick shot me” or “I was shot,” followed very quickly by an identification of “Rick” as the shooter. App. 76. In response to further questions, Covington explained that the shooting occurred through the back door of Bryant’s house and provided a physical description of the shooter. When he made the statements, Covington was lying in a gas station parking lot bleeding from a mortal gunshot wound to his abdomen. His answers to the police officers’ questions were punctuated with questions about when emergency medical services would arrive. Id., at 56-57 (suppression hearing testimony of Officer Brown). He was obviously in considerable pain and had difficulty breathing and talking. Id., at 75, 83-84 (testimony of Officer McCallister); id., at 101, 110-111 (testimony of Sgt. Wenturine); id., at. 126, 137 (testimony of Officer Stuglin). From this description of his condition and report of his statements, we cannot say that a person in Covington’s situation would have had a “primary purpose” “to establish or prove past events potentially relevant to later criminal prosecution.” Davis, 547 U. S., at 822.
For their part, the police responded to a call that a man had been shot. As discussed above, they did not know why, *376 where, or when the shooting had occurred. Nor did they know the location of the shooter or anything else about the circumstances in which the crime occurred.[19] The questions they asked — “what had happened, who had shot him, and where the shooting had occurred,” 483 Mich., at 143, 768 N. W. 2d, at 71 — were the exact type of questions necessary to allow the police to “‘assess the situation, the threat to their own safety, and possible danger to the potential victim’ ” and to the public, Davis, 547 U. S., at 832 (quoting Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty., 542 U. S. 177, 186 (2004)), including to allow them to ascertain “whether they would be encountering a violent felon,”[20] Davis, 547 U. S., at 827. In other words, they solicited the information necessary to enable them “to meet an ongoing emergency.” Id., at 822.
*377 Nothing in Covington’s responses indicated to the police that, contrary to their expectation upon responding to a call reporting a shooting, there was no emergency or that a prior emergency had ended. Covington did indicate that he had been shot at another location about 25 minutes earlier, but he did not know the location of the shooter at the time the police arrived and, as far as we can tell from the record, he gave no indication that the shooter, having shot at him twice, would be satisfied that Covington was only wounded. In fact, Covington did not indicate any possible motive for the shooting, and thereby gave no reason to think that the shooter would not shoot again if he arrived on the scene. As we noted in Davis, “initial inquiries” may “often .. . produce nontestimonial statements.” Id., at 832. The initial inquiries in this case resulted in the type of nontestimonial statements we contemplated in Davis.
Finally, we consider the informality of the situation and the interrogation. This situation is more similar, though not identical, to the informal, harried 911 call in Davis than to the structured, station-house interview in Crawford. As the officers’ trial testimony reflects, the situation was fluid and somewhat confused: The officers arrived at different times; apparently each, upon arrival, asked Covington “what happened?”; and, contrary to the dissent’s portrayal, post, at 386-387, they did not conduct a structured interrogation. App. 84 (testimony of Officer McCallister) (explaining duplicate questioning, especially as to “what happened?”); id., at 101-102 (testimony of Sgt. Wenturine) (same); id., at 126-127 (testimony of Officer Stuglin) (same). The informality suggests that the interrogators’ primary purpose was simply to address what they perceived to be an ongoing emergency, and the circumstances lacked any formality that would have alerted Covington to or focused him on the possible future prosecutorial use of his statements.
Because the circumstances of the encounter as well as the statements and actions of Covington and the police objec *378 tively indicate that the “primary purpose of the interrogation” was “to enable police assistance to meet an ongoing emergency,” Davis, 547 U. S., at 822, Covington’s identification and description of the shooter and the location of the shooting were not testimonial hearsay. The Confrontation Clause did not bar their admission at Bryant’s trial.
H: * *
For the foregoing reasons, we hold that Covington’s statements were not testimonial and that their admission at Bryant’s trial did not violate the Confrontation Clause. We leave for the Michigan courts to decide on remand whether the statements’ admission was otherwise permitted by state hearsay rules. The judgment of the Supreme Court of Michigan is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

It is so ordered.

Justice Kagan took no part in the consideration or decision of this case.

 The Supreme Court of Michigan held that the question whether the victim’s statements would have been admissible as “dying declarations” was not properly before it because at the preliminary examination, the prosecution, after first invoking both the dying declaration and excited utterance hearsay exceptions, established the factual foundation only for *352 admission of the statements as excited utterances. The trial court ruled that the statements were admissible as excited utterances and did not address their admissibility as dying declarations. 483 Mich., at 153-154, 768 N. W. 2d, at 76-77. This occurred prior to our 2004 decision in Crawford v. Washington, 541 U. S. 36, where we first suggested that dying declarations, even if testimonial, might be admissible as a historical exception to the Confrontation Clause. Id., at 56, n. 6; see also Giles v. California, 554 U. S. 353, 358-359 (2008). We noted in Crawford that we “need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations.” 541 U. S., at 56, n. 6. Because of the State’s failure to preserve its argument with regard to dying declarations, we similarly need not decide that question here. See also post, p. 395 (Ginsburg, J., dissenting).

 We noted in Crawford, that “[w]e use the term ‘interrogation’ in its colloquial, rather than any technical legal, sense,” and that “[j]ust as various definitions of‘testimonial’ exist, one can imagine various definitions of ‘interrogation,’ and we need not select among them in this case.” 541 U. S., at 53, n. 4. Davis did not abandon those qualifications; nor do we do so here.

 Davis explained that 911 operators “may at least be agents of law enforcement when they conduct interrogations of 911 callers,” and therefore “eonsider[ed] their acts to be acts of the police” for purposes of the opinion. 547 U. S., at 823, n. 2. Davis explicitly reserved the question “whether and when statements made to someone other than law enforcement personnel are ‘testimonial.’ ” Ibid. We have no need to decide that question in this case either because Covington’s statements were made to police officers. Justice Scania also claims to reserve this question, see post, at 381, n. 1 (dissenting opinion) (hereinafter dissent), but supports one of its arguments by relying on King v. Brasier, 1 Leach 199, 200, 168 Eng. Rep. 202, 202-203 (K. B. 1779), which involved statements made by a child to her mother — a private citizen — -just after the child had been sexually assaulted. See also Crawford, 541 U. S., at 69-70 (Rehnquist, C. J., concurring in judgment) (citing King v. Brasier for the different proposition that “out-of-court statements made by someone other than the accused and not *358 taken under oath, unlike ex parte depositions or affidavits, were generally not considered substantive evidence upon which a conviction could be based”).

 Contrary to the dissent’s excited suggestion, nothing in this opinion casts “favorable light,” post, at 389, on the conduct of Sir Walter Raleigh’s trial or other 16th- and 17th-century English treason trials. The dissent is correct that such trials are “unquestionably infamous,” post, at 390, and our decision here confirms, rather than undermines, that assessment. See also n. 17, infra. For all of the reasons discussed in Justice Thomas’ opinion concurring in the judgment, the situation presented in this case is nothing like the circumstances presented by Sir Walter Raleigh’s trial. See post, p. 378.

 See Davis v. Washington, 547 U. S. 813, 823-824 (2006) (explaining the question before the Court as “whether the Confrontation Clause applies only to testimonial hearsay” and answering in the affirmative because “[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its ‘core,’ but its perimeter”). See also post, at 380-381 (Scalia, J., dissenting).

 Bryant suggests that Michigan is arguing for “a subjective analysis of the intent of the interrogator’s questioning.” Brief for Respondent 12. We do not read Michigan’s brief to be arguing for a subjective inquiry, and any such argument would be in error. We do not understand the dissent to disagree that the inquiry is objective.

 This approach is consistent with our rejection of subjective inquiries in other areas of criminal law. See, e. g., Whren v. United States, 517 U. S. 806, 813 (1996) (refusing to evaluate Fourth Amendment reasonableness subjectively in light of the officers' actual motivations); New York v. Quarles, 467 U. S. 649, 655-656, and n. 6 (1984) (holding that an officer’s subjective motivation is irrelevant to determining the applicability of the *361 public safety exception to Miranda v. Arizona, 384 U. S. 436 (1966)); Rhode Island v. Innis, 446 U. S. 291, 301-302 (1980) (holding that a police officer’s subjective intent to obtain incriminatory statements is not relevant to determining whether an interrogation has occurred).

 The existence of an ongoing emergency must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight. If the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause. The emergency is relevant to the “primary purpose of the interrogation” because of the effect it has on the parties’ purpose, not because of its actual existence.

 Many other exceptions to the hearsay rules similarly rest on the belief that certain statements are, by their nature, made for a purpose other than use in a prosecution and therefore should not be barred by hearsay prohibitions. See, e. g., Fed. Rules Evid. 801(d)(2)(E) (statement by a co-conspirator during and in furtherance of the conspiracy); 803(4) (statements for purposes of medical diagnosis or treatment); 803(6) (records of regularly conducted activity); 803(8) (public records and reports); 803(9) (records of vital statistics); 803(11) (records of religious organizations); 803(12) (marriage, baptismal, and similar certificates); 803(13) (family records); 804(b)(3) (statement against interest); see also Melendez-Diaz v. Massachusetts, 557 U. S. 305, 324 (2009) (“Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because — having been created for the administration of an entity’s affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial”); Giles v. California, 554 U. S., at 376 (noting in the context of domestic violence that “[statements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules”); Crawford, 541 U. S., at 56 (“Most of the hearsay exceptions covered statements that by their nature were not testimonial — for example, business records or statements in furtherance of a conspiracy”).

 Recognizing the evolutionary potential of a situation in criminal law is not unique to the Confrontation Clause context. We noted in Davis that “[j]ust as, for Fifth Amendment purposes, ‘police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect,’... trial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial.” 547 U. S., at 829 (quoting New York v. Quarles, 467 U. S., at 658-659).

 Some portions of Davis, however, have caused confusion about whether the inquiry prescribes examination of one participant to the exclusion of the other. Davis’ language indicating that a statement’s testimonial or nontestimonial nature derives from “the primary purpose of the interrogation,” 547 U. S., at 822 (emphasis added), could be read to suggest that the relevant purpose is that of the interrogator. In contrast, footnote 1 in Davis explains, “it is in the final analysis the declarant’s statements, not the interrogator’s questions, that the Confrontation Clause requires us to evaluate.” Id., at 822-823, n. 1. Bryant draws on the footnote to argue that the primary purpose inquiry must be conducted solely from the perspective of the declarant, and argues against adoption of a purpose-of-the-interrogator perspective. Brief for Respondent 10-13; see also Brief for Richard D. Friedman as Amicus Curiae 5-15. But this statement in footnote 1 of Davis merely acknowledges that the Confrontation Clause is not implicated when statements are offered “for purposes other than establishing the truth of the matter asserted.” Crawford, 541 U. S., at 60, n. 9. An interrogator’s questions, unlike a de-clarant’s answers, do not assert the truth of any matter. The language in the footnote was not meant to determine how the courts are to assess the nature of the declarant’s purpose, but merely to remind readers that it is the statements, and not the questions, that must be evaluated under the Sixth Amendment.

 In such a situation, the severe injuries of the victim would undoubtedly also weigh on the credibility and reliability that the trier of fact would afford to the statements. Cf. Advisory Committee’s Notes on Fed. Rule Evid. 803(2), 28 U. S. C. App., p. 371 (noting that although the “theory” of the excited utterance exception “has been criticized on the ground that excitement impairs [the] accuracy of observation as well as eliminating conscious fabrication,” it “finds support in cases without number” (citing 6 J. Wigmore, Evidence § 1750 (J. Chadbourn rev. 1976))).

 Of course the Confrontation Clause is not the only bar to admissibility of hearsay statements at trial. State and federal rules of evidence prohibit the introduction of hearsay, subject to exceptions. Consistent with those rules, the Due Process Clauses of the Fifth and Fourteenth Amendments may constitute a further bar to admission of, for example, unreliable evidence. See Montana v. Egelhoff, 518 U. S. 37, 53 (1996) (plurality opinion) (“[Ejrroneous evidentiary rulings can, in combination, rise to the level of a due process violation”); Dutton v. Evans, 400 U. S. 74, 96-97 (1970) (Harlan, J., concurring in result) (“[T]he Fifth and Fourteenth Amendments’ commands that federal and state trials, respectively, must be conducted in accordance with due process of law” are the “standard” by which to “test federal and state rules of evidence”).

 See App. 76 (testimony of Officer MeCallister); id., at 101, 113-114 (testimony of Sgt. Wenturine); id., at 127, 131-133 (testimony of Officer Stuglin). Covington told them that Rick had shot him through the back door of Rick’s house, id., at 127-128 (testimony of Officer Stuglin), located at the corner of Pennsylvania and Laura, id., at 102 (testimony of Sgt. Wenturine), and that Covington recognized Rick by his voice, id., at 128 (testimony of Officer Stuglin). Covington also gave them a physical description of Rick. Id., at 84-85, 93-94 (testimony of Officer MeCallister); id., at 103, 115 (testimony of Sgt. Wenturine); id., at 134 (testimony of Officer Stuglin).

 See id., at 114 (testimony of Sgt. Wenturine) (“Q Did he tell you what Rick said? A He said they were having a conversation. Q Did he tell you what Rick said? A He did not” (paragraph breaks omitted)); see also id., at 79 (testimony of Officer McCallister); id., at 128 (testimony of Officer Stuglin).

 See id., at 127-128 (testimony of Officer Stuglin) (“A He said he’d went up, he went up to the back door of a house; that a person he said he knew, and he was knocking and he was knocking on the door he said he’d talked to somebody through the door. He said he recognized the voice. Q Did he say who it was that he recognized the voice of? A That’s [when] he told me it was, he said it was Rick a/k/a Buster. Q And did he say what the conversation was about at the door? A I don’t, I don’t believe so. Q All right. And did he say what happened there, whether or not they had a conversation or not, did he say what ended up happening? A He said what happened was that he heard a shot and then he started to turn to get off the porch and then another one and then that’s when he was hit by a gunshot” (paragraph breaks omitted)). Unlike the dissent’s apparent ability to read Covington’s mind, post, at 384-385, we rely on the available evidence, which suggests that Covington perceived an ongoing threat.

 It hardly bears mention that the emergency situation in this case is readily distinguishable from the “treasonous conspiracies of unknown scope, aimed at killing or overthrowing the King,” post, at 389, about which the dissent is quite concerned.

 Although the dissent claims otherwise, post, at 385, at least one officer asked Covington something akin to “how was he doing.” App. 131 (testimony of Officer Stuglin) (“A I approached the subject, the victim, Mr. Covington, on the ground and had asked something like what happened or are you okay, something to that line. ... Q So you asked this man how are you, how are you doing? A Well, basically it’s, you know, what’s wrong, you know” (paragraph breaks omitted)). The officers also testified about their assessment of Covington’s wounds. See id., at 35 (suppression hearing testimony of Officer Brown) (“[H]e had blood ... on the front of his body”); id., at 75 (testimony of Officer McCallister) (“It appeared he .had a stomach wound of a gunshot”); id., at 132 (testimony of Officer Stuglin) (“Q Did you see the wound? A Yes, I did. Q You had to move some clothing to do that? A Yes” (paragraph breaks omitted)).

 Contrary to the dissent’s suggestion, post, at 386, and despite the fact that the record was developed prior to Davis’ focus on the existence of an “ongoing emergency,” the record contains some testimony to support the idea that the police officers were concerned about the location of the shooter when they arrived on the scene and thus to suggest that the purpose of the questioning of Covington was to determine the shooter's location. See App. 136 (testimony of Officer Stuglin) (stating that upon arrival officers questioned the gas station clerk about whether the shooting occurred in the gas station parking lot and about concern for safety); see also ibid. (testimony of Officer Stuglin) (“Q ... So you have some concern, there may be a person with a gun or somebody, a shooter right there in the immediate area? A Sure, yes. Q And you want to see that that area gets secured? A Correct. Q For your safety as well as everyone else? A Correct” (paragraph breaks omitted)); id., at 82 (testimony of Officer McCallister). But see id., at 83 (cross-examination of Officer McCallister) (“Q You didn’t, you didn’t look around and say, gee, there might be a shooter around here, I better keep an eye open? A I did not, no. That could have been my partner I don’t know” (paragraph breaks omitted)).

 Hiibel, like our post-Crawford Confrontation Clause cases, involved domestic violence, which explains the Court’s focus on the security of the victim and the police: They were the only parties potentially threatened by the assailant. 542 U. S., at 186 (noting that the ease involved a “domestic assault”).